UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>SAMMY SULTAN, )<br>)<br>Defendant. )<br>) | Case No. 22-cr-10284-LTS |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The defendant Sammy Sultan ("Sultan") has been convicted of transmitting in interstate and foreign commerce a threat to injure the person of another, in violation of 18 U.S.C. § 875(c). As described in the Presentence Investigation Report ("PSR"), on May 28, 2021, Sultan made a series of calls to the Tufts University Police Department ("TUPD"). In those calls, he claimed that he had snuck into an unidentified female's dorm room somewhere on the Tufts University campus; that he was a former "special forces" member who had "escaped from a hospital;" that he was hiding underneath a bed; that he possessed several pistols as well as a taser; and that he intended to use the taser if the unidentified female whose dorm room he occupied returned to the room and discovered him hiding under the bed. PSR, ¶¶ 8-9.

The defendant's crime is serious. As a result of Sultan's calls, TUPD personnel and local law enforcement officers conducted an hours-long, room-by-room search of numerous buildings on the Tufts University campus. *Id.*, ¶ 13. Notifications sent by TUPD resulted in panicked phone calls from individuals on the Tufts campus. *Id*. The government therefore recommends that he be sentenced to 37 months' imprisonment and three years of supervised release. This sentence reflects the seriousness of the offense and is sufficient, but not greater than necessary, to promote respect for the law, provide just punishment to the defendant, and adequately deter others from committing

similar crimes.

## The Sentencing Guidelines Calculation

There is no plea agreement in this case. According to the PSR, the base offense level for the crime is 12. *Id.*, ¶ 33. The defendant receives a two-point enhancement under USSG § 2A6.1(b)(2)(A) because the offense involved more than two threats, and a four-point enhancement under USSG § 2A6.1(b)(4)(A) because the offense resulted in substantial disruption of public, governmental, or business functions or services. *Id.*, ¶¶ 34-35. Finally, the defendant's offense level is decreased by 3 points under USSG § 3E1.1 because the defendant accepted responsibility for his crimes. *Id.*, ¶¶ 41-42. The total offense level, therefore, is 15.

The defendant also has an extensive criminal history which results in a criminal history score of seven, and which places the defendant into criminal history category IV. *Id.*, ¶¶ 59-60. As a result, the Guideline Sentencing Range is 30-37 months.

## The Government's Recommendation

The Supreme Court has directed federal trial courts to initially calculate the appropriate sentencing range under the advisory Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 41 (2007). The Sentencing Guidelines, the Supreme Court has acknowledged, are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. Therefore, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. Given the Sentencing Commission's important institutional role and expertise, the Guideline Sentencing Range often will "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Kimbrough*, 552 U.S. 85, 89 (2007) (internal quotations omitted); *see also United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008) (holding that "a major deviation from … [the guidelines] must be

supported by a more significant justification than a minor one").

The starting point, therefore, is the Guideline Sentencing Range of 30-37 months. Considering all the relevant sentencing factors, including the defendant's long history of committing this precise crime, his disregard for his victims, his attempts to conceal his identity while committing the crime, and the significant law enforcement response prompted by the defendant's actions, as well as the defendant's decision to plead guilty, the government is recommending that Sultan be sentenced to the high end of the Guideline Sentencing Range: 37 months' imprisonment and three years of supervised release. This sentence is sufficient but not greater than necessary to comply with the overall purposes of sentencing.

To start, this was not the first time Sultan committed a crime like this. In 2017, the defendant was convicted in the Northern District of California with making obscene or harassing phone calls, and was ultimately sentenced to two years' imprisonment. *Id*., ¶ 58. In that instance, between February 2015 and August 2016, Sultan placed **_hundreds_** of obscene and harassing telephone calls to law enforcement agencies throughout the United States, Great Britain, and Canada. In those calls, Sultan frequently asked to speak with female law enforcement staff and engaged those officers in lengthy conversations. He often claimed to have escaped from a mental institution, to be in possession of numerous firearms, and to be holding an unknown female hostage in a motel room. During many of these calls, there were audible screams heard in the background, which Sultan claimed were coming from the hostage. *Id.*

Sultan was released in 2019 and remained on supervised release until August 2020. By 2021, however, undeterred by his previous incarceration, he was once again perpetrating the same crimes. As described in the PSR, on May 28, 2021, Sultan called TUPD eight times between 6:38 a.m. and 8:35 a.m. EDT. In total, the eight calls lasted for more than one hour, during which time TUPD personnel maintained an active and ongoing dialogue with the defendant. Six of the calls

included specific threats:

- In a call commencing at or about 6:41 a.m. EDT, Sultan informed a TUPD employee that he wanted to speak to a "lady officer," said that he had entered a room on the Tufts University campus, and then said, "I have a lot of weapons;" "If the lady that comes into the room… I'm going to have to tase her;" "I'm going to go tase somebody;" "I'm gonna go tase somebody now;" and "I'm going to throw the phone away in the toilet and I'm going to tase somebody now." During the call, the sound of what appeared to be a taser being activated, and a handgun being racked or cycled, could be heard in the background. Contemporaneously with these sounds being made, Sultan claimed that the sounds were an X26 taser and a pistol.

- In a call commencing at or about 6:54 a.m. EDT, Sultan informed a TUPD employee that "I'm going to tase somebody."

- In a call commencing at or about 7:03 a.m. EDT, Sultan informed a TUPD employee that "I'm going to go tase somebody now" and "If the lady comes back into the room, and tries to look under the bed, I have to tase her." During the call, the sound of what appeared to be a taser being activated, and a handgun being racked or cycled, could again be heard in the background. Contemporaneously with these sounds being made, Sultan claimed that the first sound was an X26 taser, and also said he possessed pistols.

- In a call commencing at or about 7:25 a.m. EDT, Sultan informed a TUPD employee that "If a lady comes into the room and sees me under the bed, I'll have to tase her;" "I'll tase her and then you'll know I'm telling the truth;" and "I'm going to go tase someone right now." During the call, the sound of what appeared to be a taser being activated, and a handgun being racked or cycled, could be heard in the background.

- In a call commencing at or about 8:16 a.m. EDT, Sultan informed a TUPD employee that "I have a lot of weapons;" "I am going to go tase somebody;" "I have a taser;" and "You'll know what room I'm in when I go tase her."

- In a call commencing at or about 8:35 a.m. EDT, Sultan informed a TUPD employee that "I am going to go tase someone" and "I am going to tase someone."

*Id.* ¶ 10.

Nor was this the only series of calls placed by Sultan after the conclusion of his supervised release. As described in the PSR, law enforcement's investigation revealed reports from numerous law enforcement and animal control agencies around the United States, demonstrating that Sultan was repeatedly placing similarly disturbing calls. *Id.*, ¶ 27. The FBI was able to receive records and

4

audio recordings of some of those calls, including a September 17, 2021 call placed by Sultan to the Warwick County Animal Control in Indiana; three calls on October 26, 2021 placed by Sultan to the Ozark (Arkansas) Police Department and the Franklin County Sherriff's Office in Ozark, Arkansas; and a December 22, 2021 call placed by Sultan to the Powhatan Sheriff's Office in Virginia. *Id.*, ¶ 28. The FBI was able to determine by listening to these recordings that the voice was, in fact, the defendant's. *Id*. In other words, not long after he had left prison and concluded his supervised release, the defendant took up again with the same activities that had led to his previous incarceration.

Sultan also took significant steps to conceal his identity and avoid detection. As the PSR describes, Sultan used different telephone numbers provided by the company TextNow, Inc., in an attempt to avoid having the calls to Tufts traced back to him. *Id.*, ¶¶ 15-16. Some of those numbers were in fact registered on the exact same day as when he called Tufts. *Id*. He also used different email accounts to register the numbers – again, in an apparent attempt to avoid detection. *Id*. In other words, Sultan knew what he was doing was wrong, knew it was illegal, did it anyways, and took numerous steps to cover his tracks.

Sultan's actions with respect to Tufts also sparked a significant law enforcement response and caused a serious danger to the community – all of which he intended. In his calls to TUPD, Sultan stated that he was hiding in a dorm room and gave the names of numerous buildings located on the Tufts University campus, even though he was, in fact, in California. *Id.*, ¶ 9, 11. Based on Sultan's actions, TUPD officers were seriously concerned that Sultan intended to commit violence, potentially against the unidentified female in whose dorm room Sultan claimed to be hiding. *Id.*, ¶¶ 9, 12. This resulted in a massive, hours-long, room-by-room search through Tufts University dormitories. *Id.*, ¶ 13. It resulted in panicked phone calls by members of the Tufts University community to TUPD. *Id*. By his actions, Sultan created a dangerous situation in which, fortunately,

no one was harmed.

      Lastly, Sultan's actions showed a marked disregard for his victims. He purposefully caused panic across the Tufts campus. As part of his overall modus operandi, he sought out female dispatchers, and his calls would frequently turn sexual in nature. *Id*., ¶ 28. At other times, he led law enforcement officers to believe that the was actively committing animal cruelty – such that the cries of the animals could be heard over the phone. *Id*. That he did this over and over again indicates Sultan's clear lack of understanding – or lack of caring – for the negative, potentially traumatic impact he had on others.

      In short, when it comes to making threatening and harassing phone calls, the defendant is a major repeat offender. He has made them for years, in the United States and elsewhere. No past measures have curbed his actions – with the exception of incarceration. As a result, the government believes that both incarceration and a significant period of supervised release are necessary to ensure the safety of the community and to ensure that the defendant does not continue to undertake these actions in the future. Given this, the government recommends that Sultan be sentenced at the high end of the Guideline Sentencing Range – i.e., to a period of incarceration of 37 months, and three years of supervised release. Such a sentence will adequately punish the defendant, promote respect for the law, and provide strong general deterrence.

## CONCLUSION

For the reasons set forth above, the government respectfully asks the Court to impose a sentence of 37 months of imprisonment and three years of supervised release.

                                                Respectfully submitted,

                                                JOSHUA S. LEVY
                                                Acting United States Attorney

                              By:    */s/ Timothy H. Kistner*
                                                Timothy H. Kistner
                                                Assistant U.S. Attorney

Dated:  October 19, 2023

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the defendant, who are registered participants as identified on the Notice of Electronic Filing (NEF).

                         By:    /s/ *Timothy H. Kistner*
                                    Timothy H. Kistner
                                    Assistant U.S. Attorney